No. 69,707

STATE OF KANSAS, *Appellee,* v. MICHAEL HAYS, *Appellant.*
(883 P.2d 1093)

Opinion filed October 28, 1994.

*Charles A. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, argued the cause and was on the brief for appellant.

*Charles R. Reimer*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellant.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by Michael A. Hays from his convictions (by a jury) of aggravated burglary (a class C felony), aggravated robbery (a class B felony), kidnapping (a class B felony), and criminal damage to property (a class E felony). He was sentenced to a controlling term of 30 years to life.

The defendant contends the trial court erred in allowing the jury to submit written questions to be asked of a witness and in the method used in asking the questions. He also contends there is not sufficient evidence to support the convictions for aggravated robbery and kidnapping and that the prosecutor's closing argument was improper.

Shortly before 1:00 a.m. on October 1, 1992, four white males broke into the home of Deborah and Bruce Sauer. Deborah was in the bedroom when she heard a noise at the front door. When she went into the hallway, she observed four men break through the front door. All of the men were wearing jeans and black t-shirts, and three of them had crowbars. Deborah recognized one of the men as Michael Hays, the defendant.

After the four men entered the house, one of the men held Deborah against the wall with a crowbar. Hays and another man went into the kitchen. Deborah was unable to observe them in the kitchen. The fourth man took her Tandy 1000 computer, which was in the living room. He then went outside, and through the window Deborah observed him throw the computer monitor against Bruce's truck. Marks on the monitor and truck were consistent with the monitor having been thrown against the truck. The man then returned to the living room, and Hays and the other man ran out of the kitchen and the three left the house. Deborah again observed Hays as he was leaving. The man holding Deborah against the wall then released her and left.

After the men left, Deborah discovered that her purse, containing identification and some money, was missing. A sander and some cigarettes and a lighter were also missing. Deborah did not see who carried the items out of the house. Deborah's computer was destroyed. There was also damage to the screen door and to Bruce's truck.

After police arrived, Bruce took Officer Herring to a house where he thought Hays might be. Bruce identified Hays' car. Officer Herring observed three or four dark t-shirts on the front and back seats of the car. The hood of the car was warm, suggesting it had been driven recently. Officer Herring knocked on the door of the house repeatedly, but no one answered. However,

Officer Herring could see at least six individuals through the window curtains, and he heard an unidentified male voice say not to open the door.

Hays was arrested some two and a half hours later while driving his mother to work in his car. Hays was wearing shorts and no shoes, though he admitted he was wearing jeans earlier in the evening.

Hays was charged with one count each of aggravated burglary, kidnapping, aggravated robbery, and criminal damage to property. The jury convicted him of all four counts. Hays was sentenced to concurrent terms of 5 to 20 years for aggravated burglary and 15 years to life for kidnapping and to concurrent terms of 15 years to life for aggravated robbery and 1 to 5 years for criminal damage to property. The concurrent sentences imposed for aggravated robbery and criminal damage to property were ordered to run consecutive to the concurrent sentences imposed for aggravated burglary and kidnapping, for a controlling term of 30 years to life.

## QUESTIONS

Hays contends that the trial judge committed reversible error when he asked questions of witnesses and permitted the jury to submit written questions.

Hays points out that while the trial judge may ask questions of witnesses, the judge must take great care and must not act as an advocate or give the impression of partiality or bias. Hays asserts that Judge Watson did not refrain from being biased and that Judge Watson was rude to defense counsel and to a witness who testified that Hays did not commit the crimes. Moreover, Hays points out that Judge Watson's question to Officer Dessenberger concerning the shorts Hays was wearing at the time of his arrest was based on some mysterious, unspoken communication Judge Watson received from the jury.

This court has approved the examination of witnesses by the trial judge.

"[T]he purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant and it is a part of the business of the trial judge to see that this end is attained, even though in accomplishing the full development of the truth it sometimes becomes necessary for him to examine and

cross-examine the witnesses." *State v. Boyd,* 222 Kan. 155, 158, 563 P.2d 446 (1977).

"Where a trial judge deems it necessary to cross-examine a witness, he must exercise great care to prevent giving the jury the impression that he is biased against the defendant and he must not forget the function of a judge and assume that of an advocate."

"If a trial judge believes that additional information should be obtained from a witness in order to clarify the evidence and enable the jury to arrive at the true facts, the better practice is for the trial judge to discuss the matter with counsel outside the presence of the jury and request counsel to pose the questions to the witness." *Boyd,* 222 Kan. 155, Syl. ¶¶ 1-2.

See *State v. Ridge,* 141 Kan. 60, Syl. ¶ 3, 40 P.2d 424 (1935).

In *State v. Anderson,* 243 Kan. 677, 677-78, 763 P.2d 597 (1988) (quoting *State v. Hamilton,* 240 Kan. 539, Syl. ¶ 5, 731 P.2d 863 [1987]), this court set forth our standard of review of claims of judicial misconduct in questioning witnesses:

" 'Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct; and in order to warrant or require the granting of a new trial it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party.' "

Hays has not shown that his substantial rights were prejudiced here. While Judge Watson did not give counsel an opportunity to object out of the presence of the jury before posing the questions to the witnesses as was recommended in *Boyd,* that fact does not require reversal. Hays raises no objection to the questions that were asked; his only objection is that in asking the questions, Judge Watson became biased and was rude to defense counsel and a witness. We do not find that Judge Watson's questions and comments reveal he assumed the role of an advocate, nor did he show bias or prejudice. The examples of alleged misconduct set forth by defense counsel are of no real import and did not prejudice the defendant.

Hays also asserts that the trial court committed reversible error by permitting jurors to ask questions of witnesses. The questions were submitted during the morning recess after trial began. Deborah and Bruce Sauer had been the only witnesses at that point. The court reporter presented the jury's questions to the court. The defense objected that permitting the jury to ask questions

violated Hays' right to a fair trial because it enabled the State to shape its case based on questions from the jury during trial. Judge Watson overruled the objection, noting his obligation to let the truth fall where it may. Judge Watson also pointed out that the questions propounded by the jury would not necessarily favor the State.

When the jury returned to the courtroom, Judge Watson stated, in pertinent part:

"The jury has requested the following information: Were the drapes in the living room opened or closed; two, where was the window from where she was standing. . . . I'll ask that the District Attorney put Miss Sauer on and ask that those questions be posed to her for the reason that she's the one that drew that diagram and the defense will be allowed to cross examine if there's any necessity for cross examination in his mind as long as it relates to the questions that were asked of Miss Sauer."

Deborah was recalled, and the prosecutor inquired whether the drapes in the living room were open or closed. Deborah responded, "[W]e kept them open most of the time, but I don't recall on that particular night whether they were opened or closed." Deborah also testified about the location of the window in relation to where she was standing, and she located the window on a diagram.

The defendant argues that this procedure was contrary to K.S.A. 22-3420(2), which requires the trial judge to admonish the jury not to converse with any other person on the subject of the trial. Hays reasons that the jury's questions reveal the jurors began discussing the case and came to a conclusion about what questions should be asked. Moreover, Hays argues, K.S.A. 22-3420(3), which permits a jury to request information during deliberations, implicitly prohibits a jury from requesting information before it begins deliberating. The defendant's appeal focuses only on the procedure or practice of permitting jurors to question witnesses; he makes no argument that the questions themselves were improper or irrelevant.

This issue is one of first impression in Kansas. In *Rood v. Kansas City Power & Light Co.*, 243 Kan. 14, 17, 755 P.2d 502 (1988), a civil case, this court acknowledged that the trial court permitted

jurors to submit questions of witnesses, but the propriety of that procedure was not an issue raised in the appeal.

Other jurisdictions have thoroughly considered this issue. See generally 75B Am. Jur. 2d, Trial §§ 1624-1626 and Annot., 31 A.L.R.3d 872. The majority of those jurisdictions which have addressed the issue hold that permitting jurors to question witnesses lies within the sound discretion of the trial court. Some of these jurisdictions expressly approve of juror questions, while others discourage the practice. All, however, agree that it is a matter within the trial court's discretion and that generally a verdict will not be reversed absent a showing of prejudice. See, *e.g.*, *United States v. Sutton*, 970 F.2d 1001 (1st Cir. 1992); *United States v. Lewin*, 900 F.2d 145 (8th Cir. 1990); *United States v. Polowichak*, 783 F.2d 410 (4th Cir. 1986); *United States v. Callahan*, 588 F.2d 1078 (5th Cir.), *cert. denied* 444 U.S. 826 (1979); *United States v. Gonzales*, 424 F.2d 1055 (9th Cir. 1970); *United States v. Witt*, 215 F.2d 580 (2nd Cir.), *cert. denied* 348 U.S. 887 (1954); *State v. LeMaster*, 137 Ariz. App. 159, 669 P.2d 592 (1983); *Nelson v. State*, 257 Ark. 1, 513 S.W.2d 496 (1974); *People v. McAlister*, 167 Cal. App. 3d 633, 213 Cal. Rptr. 271 (1985); *Spitzer v. Haims & Co.*, 217 Conn. 532, 587 A.2d 105 (1991); *Yeager v. Greene*, 502 A.2d 980 (D.C. 1985); *Ferrara v. State*, 101 So. 2d 797 (Fla. 1958); *Carter v. State*, 250 Ind. 13, 234 N.E.2d 650 (1968); *Rudolph v. Iowa Methodist Medical Ctr.*, 293 N.W.2d 550 (Iowa 1980); *Transit Auth. of River City v. Montgomery*, 836 S.W.2d 413 (Ky. 1992); *People v. Heard*, 388 Mich. 182, 200 N.W.2d 73 (1972); *State v. Crawford*, 96 Minn. 95, 104 N.W. 822 (1905); *Lucas v. State*, 381 So. 2d 140 (Miss. 1980); *Sparks v. Daniels*, 343 S.W.2d 661 (Mo. App. 1961); *State v. Jumpp*, 261 N.J. Super. 514, 619 A.2d 602 (1993); *State v. Rodriguez*, 107 N.M. 611, 762 P.2d 898 (1988); *People v. Knapper*, 230 App. Div. 487, 245 N.Y.S. 245 (1930); *State v. Howard*, 320 N.C. 718, 360 S.E.2d 790 (1987); *State v. Sheppard*, 100 Ohio App. 345, 128 N.E.2d 471 (1955), *aff'd* 165 Ohio St. 293, 135 N.E.2d 340, *cert. denied* 352 U.S. 910 (1956); *Krause v. State*, 75 Okla. Crim. 381, 132 P.2d 179 (1942); *Reese v. Pittsburgh*, 313 Pa. 32, 169 A. 366 (1933); *Day v. Kilgore*, 444 S.E.2d 515 (S.C. 1994); *Byrge v. State*,

575 S.W.2d 292 (Tenn. Crim. App. 1978); *State v. Johnson,* 784 P.2d 1135 (Utah 1989); *State v. Munoz,* 67 Wash. App. 533, 837 P.2d 636 (1992). But see *State v. Zima,* 237 Neb. 952, 468 N.W.2d 377 (1991); *Morrison v. State,* 845 S.W.2d 882 (Tex. Crim. 1992).

There are many risks associated with permitting jurors to ask questions of witnesses, depending upon how the trial judge handles the matter. These include: (1) Counsel may be forced to either make an objection to a question in front of the juror who asks the question, at the risk of offending the juror, or withhold the objection and permit prejudicial testimony to come in without objection; (2) jurors are unfamiliar with the rules of evidence and do not know what questions are proper; (3) juror objectivity and impartiality may be lessened or lost; (4) if a juror submits a question in open court, the other jurors are informed as to what the questioning juror is thinking, which may begin the deliberation process before the evidence is concluded and before final instructions from the court; (5) if the juror is permitted to question the witness directly, the interaction may create tension or antagonism in the juror; (6) the procedure may disrupt courtroom decorum. See *DeBenedetto v. Goodyear Tire & Rubber Co.,* 754 F.2d 512, 516 (4th Cir. 1985); *State v. LeMaster,* 137 Ariz. at 164; *People v. McAlister,* 167 Cal. App. 3d at 645; *Spitzer v. Haims & Co.,* 217 Conn. at 546-47; *State v. Howard,* 320 N.C. at 725-26; *State v. Johnson,* 784 P.2d at 1145.

Despite these risks, most jurisdictions hold that the benefits of permitting juror questioning outweigh the risks, at least in some circumstances. Several jurisdictions hold that no contemporaneous objection is needed to preserve the issue for appeal, either because counsel should not have to make an objection in front of the jury or because in asking the questions the juror assumes the role of the trial judge, whose duty it is to control improper questions. See *People v. McAlister,* 167 Cal. App. 3d at 644; *Sparks v. Daniels,* 343 S.W.2d at 667; *State v. Howard,* 320 N.C. at 726. Others, however, hold that the failure to object to questions from jurors precludes appellate review. See *State v. Munoz,* 67 Wash. App. at 535.

Those jurisdictions which permit jurors to question witnesses reason that the purpose of a trial is a quest for truth and that juror questions may help get to the truth. Such questions may be particularly helpful in a complex case because the jury may need clarification to understand the facts. The practice may alert counsel who are familiar with the case to problems which would bother a juror hearing the case for the first time. Because the jury is the finder of fact, it should be permitted to ask questions which may assist in reaching its ultimate decision in the case. See *United States v. Sutton*, 970 F.2d at 1005; *United States v. Callahan*, 588 F.2d at 1086; *State v. LeMaster*, 137 Ariz. at 165; *Carter v. State*, 250 Ind. at 15-16; *People v. Heard*, 388 Mich. at 187.

The states which prohibit the practice of permitting jurors to submit questions of witnesses under any circumstances do so largely because the practice departs from the traditional adversary nature of judicial proceedings. See *State v. Zima*, 237 Neb. at 956; *Morrison v. State*, 845 S.W.2d at 885. The Zima court expressed concern for the effect juror questioning may have on juror impartiality and stated:

"Since due process requires a fair trial before a fair and impartial jury, [citation omitted] the judicial process is better served by the time-honored practice of counsel eliciting evidence which is heard, evaluated, and acted upon by jurors who have no investment in obtaining answers to questions they have posed. [Citations omitted.]

"Our system is an adversary one which depends upon counsel to put before lay fact finders that which should be admitted in accordance with the rules of evidence and to keep from them that which should not be received in evidence. A change in this system whereby jurors become advocates and possible antagonists of the witnesses does not on its face suggest a fairer or more reliable truth-seeking procedure." *Zima*, 237 Neb. at 956.

The Morrison court agreed that permitting jurors to actively participate in the trial by questioning witnesses distorts the jury's factfinding role and leads jurors to assume the role of advocates. *Morrison*, 845 S.W.2d at 887. While recognizing that the search for truth is an integral part of the adversary process, the court opined that due process and fundamental individual rights override the truth-finding function at times. 845 S.W.2d at 884. The

majority held that a harm analysis does not apply where the jurors are permitted to become active participants by questioning witnesses. 845 S.W.2d at 889.

Jurisdictions permitting jurors to question witnesses recommend procedures which should be followed to reduce the risks associated with the practice. Some courts recommend that the trial court inform jurors at the start of trial that they will be permitted to ask questions of witnesses, *e.g.*, *State v. LeMaster*, 137 Ariz. at 164, while others hold that questions ordinarily cannot be invited unless a juror first asks for clarification of evidence, *e.g.*, *Lucas v. State*, 381 So. 2d at 144. Questions may not be permitted except for important points or for the purpose of clarification. *United States v. Sutton*, 970 F.2d at 1005; *State v. LeMaster*, 137 Ariz. at 164. Most courts recommend that questions be submitted in writing and that jurors should not directly question the witnesses. See, *e.g.*, *United States v. Sutton*, 970 F.2d at 1005; *United States v. Lewin*, 900 F.2d at 148; *Rudolph v. Iowa Methodist Medical Ctr.*, 293 N.W.2d at 556; *Sparks v. Daniels*, 343 S.W.2d at 667. The questions should be submitted by each juror privately with no discussion among the jurors. *United States v. Lewin*, 900 F.2d at 148; *State v. LeMaster*, 137 Ariz. at 164; *State v. Jumpp*, 261 N.J. Super. at 532. Counsel should be able to make objections outside the presence of the jury. *United States v. Sutton*, 970 F.2d at 1005-06; *State v. LeMaster*, 137 Ariz. at 264; *Rudolph v. Iowa Methodist Medical Ctr.*, 293 N.W.2d at 556; *State v. Jumpp*, 261 N.J. Super. at 532. The court should rule on objections and determine the relevance of the questions before asking the questions, and the jurors should be instructed not to draw any inference if a question submitted is not asked. *United States v. Sutton*, 970 F.2d at 1005; *State v. LeMaster*, 137 Ariz. at 164; *Spitzer v. Haims & Co.*, 217 Conn. at 548; *Rudolph v. Iowa Methodist Medical Ctr.*, 293 N.W.2d at 556. The trial court should ask the questions rather than let the juror directly ask the questions, although counsel may ask the questions if there is no objection. *Rudolph v. Iowa Methodist Medical Ctr.*, 293 N.W.2d at 556. Counsel should have the opportunity to ask further questions of the witness based on the questions propounded by the

jury. *State v. LeMaster*, 137 Ariz. at 164; *Rudolph v. Iowa Methodist Medical Ctr.*, 293 N.W.2d at 556.

The State urges this court to accept the practice of allowing jurors to ask questions of witnesses. The State notes the purpose of a trial is to ascertain the truth and the trial judge has a duty to see that the truth is developed. See *State v. Thomas*, 252 Kan. 564, 570, 847 P.2d 1219 (1993); *State v. Boyd*, 222 Kan. at 158. In keeping with this purpose, the trial judge is permitted to examine or cross-examine the witnesses. *Boyd*, 222 Kan. at 158.

The State responds to Hays' argument that the jury violated its admonition not to discuss the case with each other when it asked the questions. The State suggests that the admonition does not preclude jurors from speaking with each other about the case. K.S.A. 22-3420(2) provides:

"If the jury is permitted to separate, either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, or allow themselves to be addressed by any other person on any subject of the trial, and that it is their duty not to form or express an opinion thereon until the case is finally submitted to them, and that such admonition shall apply to every subsequent separation of the jury."

The State asserts that this statute is a relaxation of the prior, more stringent statute (K.S.A. 62-1446 [Corrick]) which specifically stated that jurors had a duty not to converse among themselves. The State also points out that Hays made no objection to the admonishment given at trial, or to the lack of one. The jurors were not admonished prior to the morning recess during which they submitted the questions here. In *State v. Ralls*, 213 Kan. 249, Syl. ¶ 8, 515 P.2d 1205 (1973), this court held that the failure to admonish the jury at each separation is not prejudicial error in the absence of a showing of prejudicial misconduct on the part of the jurors.

The State reasons that the jury's discussion of the questions submitted to the court does not constitute misconduct, but even if it is viewed as misconduct, Hays has failed to show prejudice. The State points out that in *State v. Allen*, 4 Kan. App. 2d 534, 609 P.2d 219, *rev. denied* 228 Kan. 807 (1980), one of the jurors discussed the case with several nonjurors during an adjournment.

The Court of Appeals held that it was improper for the juror to comment about the trial. However, there was no indication that the juror had made up his mind as to the defendant's guilt based on anything except all of the evidence adduced at trial. It was held the trial court did not abuse its discretion in denying the defendant's motion for a new trial. 4 Kan. App. 2d at 537, 539.

A similar issue arose in *State v. Thomas*, 6 Kan. App. 2d 925, 636 P.2d 807 (1981). There, the trial involved whether a bar owner's use of a gun against troublemakers in his bar was self-defense. One of the jurors discussed with several nonjurors what should have been done to protect the bar. The juror denied having reached an opinion before the case was submitted to the jury. Further, the foreman of the jury denied that the juror mentioned her discussion to the other jurors. The Court of Appeals found that juror misconduct occurred but that the misconduct, standing alone, did not prejudice the defendant. 6 Kan. App. 2d at 930. However, because of the cumulative effect of that and other trial errors, the Court of Appeals reversed the defendant's conviction.

The State maintains that the nature of the jury's questions here does not reflect any prejudicial state of mind by the jury or that the jury discussed Hays' guilt before the case was submitted to the jury. Rather, the jury was simply clarifying evidence and seeking basic facts in the case. Moreover, the State argues, the trial court's admonition to the jury to keep an open mind minimized any danger of prejudice. The State insists that the outcome of the trial was not affected by the jury's discussion concerning the questions to ask, as there was ample evidence of Hays' guilt and the jury's questions did not go to the heart of the State's case.

The procedure followed by the trial court here acted to prevent most of the risks associated with juror questions. The questions were submitted in writing and the jury was not permitted to directly question the witnesses. Hays was given the opportunity to object outside the jury's presence. The questions were relevant and not improper. Counsel was given an opportunity to ask further questions based on those propounded by the jury, and the prosecutor's further questions were limited.

Of the recommended procedures for jury questions, two were not followed: The questions were submitted by the jury as a

group, rather than by individual jurors without prior discussion about the questions; and the questions were asked of the witness by the prosecutor rather than the court. We cannot find prejudice resulting from the fact that the prosecutor asked the questions rather than the court. Hays argues, "This obviously gives the impression to the jury that the prosecutor is acting on behalf of the judge." The State responds that the witness of which the questions were asked was a State's witness and therefore it makes sense that the State would conduct the questioning. The State presented the questions to the witness in language nearly identical to that used by the jury. While the trial judge rather than counsel should ask the jurors' questions, the fact that the prosecutor asked the questions rather than Judge Watson does not appear prejudicial here.

The fact that the jurors discussed among themselves what questions to ask is more troubling. While K.S.A. 22-3420(2) does not specifically preclude the jurors from discussing the case among themselves, the jurors do have the duty to keep an open mind until the case is submitted to them for deliberation. The jury's questions indicate that the jurors were discussing the evidence thoroughly enough during the morning recess that they realized they had some questions. While jurors clearly cannot refrain from assimilating and evaluating the evidence as it accumulates during trial, the jurors should not begin deliberating on the case until it is submitted to them. In *Spitzer v. Haims & Co.*, 217 Conn. at 545, the Connecticut court stated, "We properly expect jurors to refrain from deliberating on a case until it is submitted to them. [Citation omitted.] Deliberation in this sense, however, means articulating and exchanging views, albeit preliminary, with one's fellow jurors. [Citation omitted.] It does not mean the absence of thought, however preliminary."

Only two witnesses had testified at the time the jury submitted its questions. Deborah had testified that she observed through the window a man throw the computer monitor against the truck. Later evidence did reveal other circumstantial evidence that this did occur. Hays does not show how he was prejudiced by the jury's preliminary discussion, and based on the record before us,

no prejudice appears to have occurred. We do not find reversible error on this point.

In keeping with this court's view of trial as a quest for the truth, we elect to follow those jurisdictions which permit the practice of juror questions. However, many risks are involved and a trial court should discourage the practice except when the benefits outweigh the risks. The litigants have generally employed counsel of their choice who have diligently prepared for trial. The trial judge and the jury are to be fair and impartial. The appearance of fairness and impartiality is frequently lost when the trial judge or a juror becomes involved in questioning a witness. In addition, it severely disrupts trial counsel's right to present the case in the order and sequence counsel chooses and can open doors that would not otherwise have been opened. We again suggest the practice be discouraged—not encouraged. Trial courts which permit jurors to submit questions to witnesses should maintain strict control and should adhere to certain safeguards to minimize the risks associated with the practice. The trial court should not solicit questions and should only permit them for purposes of clarification. The testimony of a witness should not be interrupted by questions from jurors. Jurors should submit questions in writing and without any discussion with other jurors. Counsel should be afforded the opportunity to object outside the presence of the jury. The trial court must determine the relevancy of the questions. The trial court should instruct the jury not to draw any inference if a question submitted is not asked. The trial judge, rather than counsel or jurors, should question the witness. Finally, counsel should be given the right to further examine the witness following the jury's questions.

## KIDNAPPING

Hays contends the evidence was insufficient to sustain a conviction for kidnapping. Our standard of review is as follows:

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Grissom*, 251 Kan. 851, Syl. ¶ 4, 840 P.2d 1142 (1992).

K.S.A. 21-3420 defines kidnapping as follows:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
(a) For ransom, or as a shield or hostage; or
(b) To facilitate flight or the commission of any crime; or
(c) To inflict bodily injury or to terrorize the victim or another; or
(d) To interfere with the performance of any governmental or political function."

The State charged that the kidnapping was done to facilitate the crime of aggravated robbery. An aiding and abetting instruction was given.

The State argues that by holding Deborah against the wall with a crowbar, Deborah was prevented from hindering the robbers or from fleeing, thus giving the men time to complete the aggravated robbery. The State also asserts that Deborah's confinement lessened the risk of detection.

Both Hays and the State cite language from *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976). In *Buggs*, this court discussed the extent of taking or confining necessary to support a conviction for kidnapping. We held:

"Our kidnapping statute, K.S.A. 21-3420, requires no particular distance of removal, nor any particular time or place of confinement. Under that statute it is the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping."

"The word 'facilitate' in K.S.A. 21-3420 means something more than just to make more convenient. A taking or confining, in order to be said to 'facilitate' a crime, must have some significant bearing on making the commission of the crime 'easier.' "

"If a taking or confining is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

(*a*) Must not be slight, inconsequential and merely incidental to the other crime;

(*b*) Must not be of a kind inherent in the nature of the other crime; and

(*c*) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. 203, Syl. ¶¶ 7, 9, 10.

In *Buggs*, the victims were accosted outside a Dairy Queen at the fringe of the parking lot, where they were subject to public

view. The defendants forced them to return to the relative seclusion of the inside of the restaurant, though the robbery could have been accomplished outside the store or without forcing the victims into the store. This court held that the movement from outside the restaurant to inside the restaurant substantially reduced the risk of detection and was a taking or confining necessary to facilitate the commission of a robbery and a rape. 219 Kan. at 216-17. The court also gave examples, subject to qualification, of the extent of taking or confining necessary to support a kidnapping, stating:

"For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is. The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is." 219 Kan. at 216.

In *State v. Richmond*, 250 Kan. 375, 827 P.2d 743 (1992), cited by the State, the victim entered her house during a burglary. The defendant forced the victim through the house into a bedroom, raped her, tied her up, and a short time later raped her again and retied her. This court held the facts sufficient to satisfy the three-prong test set forth in *Buggs*, 219 Kan. 203, Syl. ¶ 10. The tying of the victim aided the defendant by incapacitating her while he searched her house and removed items from her house as well as her daughter's house, which was next door. The removing of the victim from the front of the house to a bedroom lessened the risk of detection of the crime by anyone arriving at the residence. We held that the confinement facilitated the commission of the crimes (rape, aggravated robbery, and aggravated burglary). *Richmond*, 250 Kan. at 378.

The incident in the case at bar does not differ from the standstill robbery described in *Buggs*. The victim was not moved at all, and the confinement was incidental to and inherent in the nature of the crime of aggravated robbery and had no significance independent of the aggravated robbery. The evidence is insufficient to support a conviction for kidnapping, and the kidnapping conviction is therefore reversed.

## AGGRAVATED ROBBERY

Hays also contends that the evidence is insufficient to support his conviction for aggravated robbery.

K.S.A. 21-3427 defines aggravated robbery as a robbery "committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." K.S.A. 21-3426 defines robbery as "the taking of property from the person or presence of another by force or by threat of bodily harm to any person." Again, an aiding and abetting instruction was given to the jury.

Hays reasons that the four men were attempting to intimidate Bruce Sauer; the incident had nothing to do with the taking of the property. He points out that there was no evidence to establish how close in proximity the property taken was in relation to the victims. Hays argues that a theft, not an aggravated robbery, occurred. In response, the State points out that the property taken need not be within the sight or hearing of the victim and that preventing the victim from protecting his or her property constituted aggravated robbery here.

In *State v. Dean*, 250 Kan. 257, Syl. ¶ 2, 824 P.2d 978 (1992), this court stated:

"To constitute the crime of robbery, it is necessary that the violence to the owner of property must either precede or be contemporaneous with the taking of the property. Robbery is not committed where the thief has gained peaceable possession of the property and uses no violence except to resist arrest or to effect his escape."

The violence here occurred both before and during the taking of the property. Almost as soon as the four men entered the Sauer residence, one man pushed Deborah against the wall. While Deborah was being restrained with a crowbar, the others took her property.

In *State v. Glymph*, 222 Kan. 73, Syl. ¶ 2, 563 P.2d 422 (1977), this court stated:

"When a victim's possession and control of property is severed by force or threat of bodily harm, it is *held* that the taking is from his 'presence' as that term is used in statutes defining robbery, although prior to the time the property is taken, the victim is forcibly removed from the premises and the taking is not within his immediate view."

Although the victim in *Glymph*, the manager of a convenience store, was forced at gunpoint to leave the store before money from the register was taken and no one observed the actual taking of the money, we held that the evidence constituted aggravated robbery. 222 Kan. at 75.

In *State v. Evans*, 251 Kan. 132, 834 P.2d 335 (1992), the victim was hit three times on the side of the head, and she fell to a couch. The defendant tied her up, and the defendant and his son took money from her bedroom. The defendant argued that the evidence was insufficient to convict him of aggravated robbery because the money was taken from the victim's bedroom while the victim was in the living room of her apartment, and therefore the money was not taken from the victim's presence. We found the defendant's argument meritless, citing *Glymph*, 222 Kan. 73.

Here, Deborah's possession and control of her property was severed while she was forced against the wall and restrained by one of the robbers wielding a crowbar. The property taken included Deborah's purse, which was in the kitchen, and a sander, which was in the living room. The taking of Deborah's purse and the sander, though not from her immediate view, was from her presence. This evidence is sufficient to support a conviction for aggravated robbery.

Hays also suggests there was no evidence that he took the property or that he was guilty of aiding and abetting. On the contrary, there was ample evidence of aiding and abetting even if Hays himself did not carry the property away from the house. Deborah testified that the four men entered the house together and left together. While in her house, the men talked to each other about where to go in the house. Deborah positively identified Hays as one of the robbers. The evidence was sufficient to support Hays' conviction as an aider and abettor.

## CLOSING ARGUMENT

For his last claim of error, Hays contends that reversible error occurred when the prosecutor improperly appealed to community interest during her closing argument. Hays directs our attention to the following, which occurred during closing argument:

"MS. PARKER [Counsel for the State]: . . . And so then I look at you and maybe all of you are saying, well, why do we care then? You know, why do we care about this case? As jurors, as a community, why do we care, you know, if these people want to do their thing? Let them do it. Here's why we care. We care because of Deborah Sauer and her grandfather that are in the house and they don't deserve as victims —

"MR. JONES [Counsel for the defendant]: I'm going to object. She's appealing to an improper sympathy of the victims. It's not proper argument.

"THE COURT: I overrule you. I overrule you.

"MS. PARKER: —'cause they're victims of a crime, 'cause they're in their own home and they don't deserve having somebody come in there and busting down the door, and the other reason is, is that in our society we don't settle our disputes by strong-arm, and that's something that our community has to say about crime."

Hays notes that we have held it improper to refer to the effect of a verdict on the community or to appeal to the interest of the jurors as members of the community. See *State v. Jordan*, 250 Kan. 180, 193, 825 P.2d 157 (1992); *State v. Zamora*, 247 Kan. 684, 689-90, 803 P.2d 568 (1990).

In *State v. Zamora*, 247 Kan. at 689, the prosecutor argued during closing remarks, "[The defendant] has raped this victim once. If he is found not guilty, he will get away with it again." The trial court overruled the defendant's timely objection. This court quoted the ABA Standards for prosecutors concerning jury argument: " 'The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.' 1 ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-5.8 (1980)." 247 Kan. at 691. This court, noting the defendant's timely objection to the improper argument, found the error reversible. 247 Kan. at 692.

In *State v. Jordan*, 250 Kan. at 193, the prosecutor argued to the jury, " 'And if you want to live in a community where a person can kill another person . . . in the manner that this was conducted and excuse it because he had a few drinks, that's up to you.' " The trial court sustained the defendant's objection that the prosecutor was trying to inflame the jury. This court agreed that

the prosecutor's argument was improper, and we noted that the argument violated the Model Rules of Professional Conduct. 250 Kan. at 196. However, we held that the violation was not reversible error because the jury was instructed several times during closing argument that statements of counsel were not evidence. Further, the trial court had sustained the objection to the remark, and we noted that the defendant had not requested a mistrial or that the jury be admonished to disregard the remark. 250 Kan. at 197.

The State argues that the prosecutor's statements were short, vague, and based on the evidence. The State points out there was no reference to cases involving other victims or to lasting effects on these victims. Nor was there evidence that the prosecutor's argument was intended to inflame the jury. Rather, the prosecutor's arguments explained to the jury why it should care about performing its civic duty as jurors. Moreover, the trial court instructed the jury that remarks of counsel are not evidence. Finally, the State argues that even if there was error, it was harmless error because the evidence against Hays was strong.

The statement was improper. However, the improper argument here was not the prosecutor's final comment to the jury. The overall thrust of the prosecutor's closing argument here focused on the evidence. The comment to which Hays objects occurred near the end of the first part of the prosecutor's closing argument. The prosecutor's next comments after that portion to which Hays objects were as follows:

"And this dispute may have been about a paycheck. It may not, but the bottom line is, is that the dispute was attempted to be settled by strong-arm violence. And I ask you as a jury to know that these—this is why—this is why you care, and this is why I'm asking you to convict Michael Hays of the crimes that he committed because you can rely on what Deborah Sauer told you and you can rely on your common sense and your reason to know what you believe about what Bruce Sauer told you and about what the defendant told you and what is true there. I thank you very much for your kind attention in this case."

After these comments, Hays' trial counsel gave closing argument, and the prosecutor gave the final portion of its closing argument.

In *State v. Green*, 254 Kan. 669, 684, 867 P.2d 366 (1994), the prosecutor's final comment during closing argument was, "What

you decide will be what our community stands for." The trial court did not rule on the defendant's objection, nor did it admonish the jury. We found no reversible error, stating:

"The prosecution is given wide latitude in language and in manner or presentation of closing argument as long as it is consistent with the evidence adduced. Improper remarks made by the prosecutor in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial. *State v. Hobbs*, 248 Kan. 342, Syl. ¶ 5, 807 P.2d 120 (1991). Here the court failed to directly rule on the objection, and, as the defense counsel did in [*Jordan*, 250 Kan. 180, the defendant's] counsel failed to move for a mistrial or to request that the court admonish the jury. The comment by the prosecutor should not have been made, and the court should have ruled on the objection." 254 Kan. at 685.

However, after reviewing the record, this court found that the prosecutor's remarks were not reversible error.

Under the unique facts of this case, the prosecutor's comments here were not so gross and flagrant as to prejudice the jury against Hays and deny him a fair trial. The unique facts are that the victim's husband could not, or would not, identify the defendant at trial as being involved in the crimes, although a law enforcement officer testified the victim's husband told him at the crime scene that the defendant was present. The prosecutor was attempting to explain to the jury why it should convict the defendant when one of the victims obviously did not want the defendant convicted. Thus, the court's failure to sustain the objection does not constitute reversible error.

The trial court is to recompute the defendant's sentence by vacating the sentence for kidnapping and furnish the Department of Corrections a corrected copy of the commitment order. It will not be necessary to return the defendant to court for resentencing, but both the defendant and the Department of Corrections are to be furnished a copy of the journal entry reflecting the corrected sentence.

Affirmed in part, reversed in part, and remanded with instructions to correct the sentence imposed.